UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WESTERLY SEID,<br><br>Defendant. | 5:21-CR-50101-JLV<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Westerly Seid is before the court on an indictment charging him with possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). See Doc. 1. Mr. Seid has filed a motion to suppress certain evidence. See Docket No. 25. The United States ("government") resists the motion. See Docket No. 32. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Jeffrey L. Viken, district judge.

## FACTS

An evidentiary hearing was held on December 15, 2021. Mr. Seid was there in person along with his lawyer, Assistant Federal Public Defender Ellie

Bastian.  The government was represented by its Assistant United States Attorney, Benjamin Patterson.  One witnesses, Rapid City Police Officer Ekaras Jackson, testified and two exhibits were received into evidence, a dashcam video from Officer Jackson's patrol vehicle and a bodycam video from Officer Jackson's person.  From this testimony and these exhibits, the court makes the following findings of fact.

On May 23, 2021, at approximately 10:30 p.m. Officer Jackson was in uniform and on patrol in a marked police vehicle.  A white sedan pulled out in front of him and he could see no license plates or temporary tags on the vehicle.  The video of the vehicle reveals a rear window on the white sedan that slopes very gradually giving the back window a slightly horizontal aspect.  Officer Jackson said it was not unusual to spot vehicles with no license plate of any kind and when he observes such a vehicle, he conducts a traffic stop.  Officer Jackson initiated a traffic stop on the white sedan he saw by turning on his lights and siren.  The white passenger vehicle pulled over.

When Officer Jackson pulled up close to the rear of the vehicle, he could see there was a white paper in the rear window, but still could not read what was written on the piece of paper and he did not then know whether the temporary license was valid or invalid.  Officer Jackson testified he has frequently encountered counterfeit temporary tags.

Officer Jackson called in his location to dispatch and gave a description of the car as a "white passenger vehicle with dealer plates."  He testified by "dealer plates" that he meant generically paper tags or that the vehicle did not

have a standard license plate. He did not mean that he had verified the validity of the piece of paper affixed to the white sedan.

Officer Jackson exited his patrol vehicle and walked up to the driver's side of the white car. As he approached the rear window and was just a couple of feet away, he could finally see the writing on the piece of paper in the window. From what he observed, he thought the temporary tag was probably valid. He testified in order to determine if a temporary tag is valid, he usually has to look at it closely enough to determine if there is "white-out" or if other means had been used to make the license fictitious. Here, he discerned no attempted alteration of the license. Officer Jackson testified it is not his policy to pull over every vehicle driving around Rapid City with dealer tags. Rather, here, he testified he pulled the car over because he had not been able to see any license at all initially.

Even though Officer Jackson now thought the tag to be valid, he testified it was official policy in the Rapid City Police Department to nevertheless identify the people in the vehicle and let them know why they had been stopped.

Officer Jackson approached the driver of the vehicle and explained he had stopped the car because he could not see the temporary tag at first. The driver volunteered his work permit paperwork which had the driver's name and date of birth on it. Officer Jackson had not asked the driver to produce any documentation at this point.

Officer Jackson could see a passenger in the front seat to the right of the driver. He asked the passenger his name. The passenger replied, "Mike Ambrose." Officer Jackson asked the passenger for an identification card, but he did not have one. Officer Jackson then asked the passenger for his full name and date of birth. The passenger specified his name was "Michael Ambrose" and gave a date of birth. He told the two occupants in the vehicle he was going to check their stuff out and get them on their way. Officer Jackson testified at the hearing that, at this point in the traffic stop, he had no intention other than to positively identify the two individuals, attach them to the call for service, and release them.

Officer Jackson wrote down the name and date of birth the passenger had given him and returned to his patrol car. By this time, a second patrol officer had arrived on scene. Officer Jackson explained to the second officer he had stopped the white car because he could not see the temporary tag at first, but now he was simply going to verify the occupants' identities and get them on their way. In his patrol vehicle, Officer Jackson verified the driver's identity and that there were no warrants out for the driver, but he was unable to verify the passenger's identity. He testified that this made him suspect the passenger was lying to him about his name.

Officer Jackson returned to the white sedan to speak to the passenger further. He testified he wanted to find out if there was an explanation for why the passenger's name did not show up in the searched database. Specifically, he wanted to know if the passenger was from another state, if the passenger

4

had a South Dakota driver's license or identification card, and whether he had ever been in trouble in South Dakota. Depending on the passenger's replies to these inquiries, Officer Jackson said he would be able to tell a bit more about whether the passenger was lying.

While Officer Jackson was speaking with the passenger about these topics, the passenger began fumbling "with stuff." Officer Jackson shined his flashlight because it was very dark in the vehicle and he thought the passenger was trying to locate some form of identification. With his flashlight, Officer Jackson saw a methamphetamine pipe partially concealed by a green bandana on the floor under the passenger's left leg.

Officer Jackson pointed out the green bandana and the passenger seemed to try to conceal the pipe. At this point, Officer Jackson ordered the passenger to raise his hands and keep them raised. The passenger did so, continuing to hold onto the green bandana. Officer Jackson then ordered the passenger to exit the vehicle. The passenger backed out of the passenger compartment, crab-like, reaching behind his back to open the passenger door. Officer Jackson testified he did not give the passenger instructions to exit the vehicle in that manner and he thought it was strange. When the passenger exited, Officer Jackson saw a handgun, which was later identified as a Taurus .38 special handgun.

The driver of the white sedan told Officer Jackson the passenger's true identity was Westerly Seid. Officer Jackson ran a records check and found Mr. Seid's mug shot and found there were three active arrest warrants in place

for Mr. Seid.  He was arrested and, later, these federal criminal charges followed.

Mr. Seid now moves to suppress the physical evidence taken from the white sedan in which he was a passenger and any statements made thereafter. He argues that Officer Jackson did not have probable cause or reasonable suspicion to conduct the traffic stop once he realized the temporary tags on the car were valid and that the stop therefore violated Mr. Seid's Fourth Amendment right to be free from unreasonable searches and seizures.  The government resists the motion.

## DISCUSSION

**A.   Fourth Amendment Arguments**

    **1.   Reasonable Suspicion to Stop the Vehicle**

Mr. Seid argues that law enforcement had no legitimate reason to stop the vehicle in which he was a passenger and that doing so violated his Fourth Amendment rights.  See Docket No. 26.  The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (quoting United States v. Martinez, 358 F.3d 1005, 1009 (8th Cir. 2004) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979))).

If there is reasonable suspicion to stop the vehicle, however, the stop complies with the Fourth Amendment.  Navarette v. California, 572 U.S. 393,

397 (2014); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). An officer making a Terry[1] stop based upon "reasonable suspicion," "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989). Instead, police must have "a 'particularized and objective basis for suspecting the particular person of criminal activity.' " Navarette, 572 U.S. at 396 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

"Reasonable suspicion" in support of a Terry stop "is dependent upon both the content of information possessed by police and its degree of reliability." Id. at 397 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). In evaluating the standard, courts must take into account "the whole picture," the "totality of the circumstances." Id. (quoting Cortez, 449 U.S. at 417). A mere "hunch" does not suffice, but the standard requires "considerably less proof of wrongdoing" than "preponderance of the evidence" or probable cause. Id. (quoting Sokolow, 490 U.S. at 7). A traffic stop need not be based on the police officer's personal observation—it can be based on information supplied by a third party. Id. Even a single anonymous tip may provide the necessary reasonable suspicion if the indicia of reliability are sufficient—such as richness of detail, eyewitness observation, use of the 911 system to report the tip, and an absence of any reason to suspect the tipster had a motive to fabricate. Id.

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

"[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007) (citing Whren v. United States, 517 U.S. 806, 813 (1996). See also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (*per curiam*) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer making the stop may have been."). Although a traffic violation can provide the basis for a Terry stop, there is no requirement that a traffic violation occur if there are other grounds providing the officer with a reasonable, articulable suspicion of criminal activity. United States v. Jacobsen, 391 F.3d 904, 907 (8th Cir. 2004) (quoting United States v. Briley, 319 F.3d 306, 364 (8th Cir. 2003) (quotation omitted)).

The Eighth Circuit has made clear that whether a stop of a vehicle with temporary licensing (paper license plates or tags) is supported by reasonable suspicion is a highly fact-specific inquiry. United States v. McLemore, 887 F.3d 861, 865 (8th Cir. 2018). The McLemore court reviewed three prior Eighth Circuit cases involving temporary license plates and explained why each was decided correctly. Id. In United States v. Sanchez, 572 F.3d 475, 478-79 (8th Cir. 2009), the court noted the officer's decision to stop was based on his observation that the vehicle had a piece of paper affixed to where the rear license plate should be, but that the paper was not a Nebraska "in transit"

sticker and the officer could not see the name of any other issuing jurisdiction. McLemore, 887 F.3d at 865 (discussing Sanchez, 572 F.2d at 478-79).

In United States v. Mendoza, 691 F.3d 954, 959 (8th Cir. 2012), the McLemore court stated the officer knew the paper tag in the vehicle's rear window was not an Iowa temporary tag and she could not identify an issuing state from 15-20 feet away. McLemore, 887 F.3d at 865 (discussing Mendoza, 691 F.3d at 959). Additionally, the officer in Mendoza had testified that the piece of paper she observed resembled fraudulent tags she had recently encountered. Id.

In United States v. Givens, 763 F.3d 987 (8th Cir. 2014), the McLemore court noted the Iowa officer in that case saw what appeared to be a paper registration card on the vehicle, but the officer could not read the card due to darkness and the angle of the windshield. McLemore, 887 F.3d at 865 (discussing Givens, 763 F.3d at 988). The officer testified he had been able to read other temporary cards at night and that he had had prior experience with invalid and fraudulent registration cards. Id. In all these cases, the Eighth Circuit had held that the stop of the vehicles in question was supported by reasonable suspicion. McLemore, 887 F.3d at 865.

By contrast, in the McLemore case, the court held the evidence failed to show "a particularized and objective basis for suspecting the particular person stopped of breaking the law." Id. (quoting Heien v. North Carolina, 574 U.S. 54, 60 (2014)). The officer testified only that she was unable to read the temporary plate on the defendant's vehicle. Id. at 865-66. The officer did not

9

identify a specific law she believed was being violated, she did not indicate she was concerned the paper tag was fraudulent, she did not testify she could usually read paper tags at night so this was unusual, and she did not indicate she believed the tag was expired. Id. What the officer *did* know about the temporary tag was that it was a car dealer's advertising plate, it was affixed where the rear license plate is customarily affixed, and it was in the form approved by the Iowa DOT. Id. at 866.

Furthermore, the officer "did not identify what information she could not see that gave her . . . reasonable suspicion of a violation." Id. The government also failed to introduce as evidence at the suppression hearing the paper vehicle license so the court itself could see if it complied with state law. Id. The court held, under these facts, the stop of defendant's vehicle was not supported by reasonable suspicion. Id. If the facts adduced were sufficient, the court observed, police would be able to stop *any vehicle* which had a dealer's paper plate any time the officer could not read the plate from inside their police cruiser. Id. That is not the law. Id. (citing United States v. Wilson, 205 F.3d 720, 722-23 (4th Cir. 2000) (*en banc*)).

Here, Officer Jackson testified at the time he initiated his lights and siren, he had been unable to see any license, temporary or permanent, on the vehicle in which Mr. Seid was traveling. However, once he pulled up behind closely behind the white sedan with his patrol vehicle, he could see there was a piece of paper in the rear window, but still could not read anything written on the paper. After he exited from his patrol car, Officer Jackson testified he

10

could read the paper once he was a couple of feet away from the paper affixed in the rear window. It is at this point Mr. Seid argues the Fourth Amendment required Mr. Jackson to tell the driver he had mistakenly stopped the vehicle and to wish the occupants of the vehicle a good night and send them on their way without further inquiry.

The court finds the Eighth Circuit does not support this proposition. Officer Jackson testified he had had frequent encounters with counterfeit plates and that in any event, he needed to make contact with the occupants of the vehicle to explain why they had been stopped. At this point, Officer Jackson asked for merely routine information—names and dates of birth—to ensure that there were not any warrants out for either occupant and to associate a name with the service call in his report. It was at this point Mr. Seid gave his false name. The court holds that, under the totality of the circumstances, at the time Officer Jackson initiated the stop, he had reasonable suspicion for the stop. He testified—and nothing undermines this testimony—that he could not see any tags on the car at all.

Although he did see a tag once he pulled up close to the white sedan, he did not discover its apparent validity until exiting his patrol car and approaching the rear of the car on foot. At this point, as a matter of official policy (not to mention common courtesy) Officer Jackson made contact with the occupants to explain why they had been stopped. The court finds Officer Jackson's actions did not run afoul of the Fourth Amendment.

### 2. Mistake of Law

Alternatively, the government argues Officer Jackson's stop of the vehicle Mr. Seid was traveling in is justifiable as an objectively reasonable mistake of fact. An officer must "have 'a reasonable basis for believing that the driver has breached a traffic law.'" United States v. Foster, 15 F.4th 874, 877 (8th Cir. 2021). If that mistake of law or fact is objectively reasonable, it may justify a stop. Id. Once an officer makes a justified, though mistaken, stop, he may make a reasonable investigation to include asking for a driver's license and registration. Id. (citing United States v. Hollins, 685 F.3d 703, 706-07 (8th Cir. 2012); United States v. Collier, 419 F. App'x 682, 684 (8th Cir. 2011); United States v. Allegree, 175 F.3d 648 (8th Cir. 1999)).

In United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012), the officers stopped an SUV because they could not observe *any* licensing. Only after the SUV was stopped did police observe a valid "in transit" sticker. Id. The court held the officers had reasonable suspicion for the stop because their mistaken belief was objectively reasonable. Id. The facts of this case are on point with the facts of the Hollins case.

Although the McLemore court rejected the government's argument that the officer in that case made a reasonable mistake, the mistake in McLemore was a mistake of *law*, not of fact, and there was established legal precedent both at the Iowa state level and at the federal Supreme Court level that were directly on point and contrary to the officer's belief as to the law. McLemore, 887 F.3d at 867. The holding of McLemore is inapposite here as Officer

12

Jackson's mistake was a mistake of *fact*, not law.  And the video of the incident tends to support his version of the facts.  It was nighttime and the rear window of the white sedan sloped at a very shallow grade, making the paper affixed at the top of the rear window difficult to see.  That, plus the reflection of street lights off the glass makes it very difficult to see the temporary tags on the vehicle at first in the video.

### 2. Duration of the Seizure

Mr. Seid also argues his Fourth Amendment rights were violated by the duration of the seizure because law enforcement did not have reasonable suspicion or probable cause to support his continued seizure once the officer was able to see the paper dealer plates in the window of the vehicle.  A traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]"  United States v. Jacobsen, 466 U.S. 109, 124 (1984).  Mr. Seid asserts that, even if the initial traffic stop was justified, the officer unjustifiably prolonged the stop beyond the limitations of the Fourth Amendment.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407 (2005)], and attend to related safety concerns[.]"  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its

underlying justification."). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Caballes, 543 U.S. at 407. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354.

"After a law enforcement officer initiates a traffic stop, the officer may detain the offending motorist while the officer completes a number of routine, but somewhat time-consuming tasks related to the traffic violation." United States v. Englehart, 811 F.3d 1034, 1040 (8th Cir. 2016) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission [during a traffic stop typically] includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355 (quotation and citation omitted). See also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)). "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a

14

driver for a longer duration than when a stop is strictly routine.' " United States v. Soderman, 983 F.3d 369, 374 (8th Cir. 2020) (quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).

To extend a routine traffic stop, an officer needs reasonable suspicion of additional criminal activity. Rodriguez, 575 U.S. at 355. Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop. Terry, 392 U.S. at 21. This standard is "less demanding" than probable cause and much lower than preponderance of the evidence. Wardlow, 528 U.S. at 123.

To determine whether the requisite degree of suspicion exists, courts must decide whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion, meaning the totality of the circumstances must be considered. Jones, 269 F.3d at 927. The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.' " Id. (quoting Reid v. Georgia, 448 U.S. 428, 441 (1980)).

The defendant in the Hollins case argued that once the officers stopped the SUV he was riding in and discovered the SUV in fact had a valid "in transit" sticker, the officers were required to end their interaction with the SUV and its occupants. Hollins, 685 F.3d at 706. The court stated "[t]his court has

15

'consistently held that "[a] reasonable investigation following a justifiable traffic stop may include asking for the driver's license and registration." ' " Id. at 706-07.  Importantly, the officer in the Hollins case testified that his experience had taught him not to accept facially valid stickers since some turn out to be not legally valid, but instead to verify the registration by requesting the driver's license, insurance card, and registration.  Id. at 707.

     Similarly, in United States v. Gomez-Serena, 368 F.3d 1037, 1039-41 (8th Cir. 2004), an officer stopped defendant's vehicle under the reasonable but mistaken belief that his license tags were expired.  After stopping the defendant, the defendant pointed out a temporary license tag in the rear window.  Id.  The officer confirmed the validity of the temporary tag, but it identified someone other than the defendant as the owner of the vehicle.  Id. at n.2.  The officer then asked for the defendant's identification and proof of insurance.  Id.  The defendant gave a false name that differed from the name tattooed across the back of his head.  Id.  The defendant argued the officer should have ended the encounter when he observed the valid temporary tag.  Id.  The court disagreed, finding the officer's brief inquiry reasonable under the circumstances:  the defendant was unable to provide a driver's license, the name on the temporary tags did not match the name defendant gave to the officer, and the name also did not match the back-of-the-head tattoo on the defendant.  Id.  The court held under these circumstances the duration of the stop was justified.  Id.

16

In <u>United States v. Clayborne</u>, 339 F.3d 700, 701 (8th Cir. 2003), an officer pulled the defendant over because he believed he had no license plate on his vehicle. When the officer told the defendant why he had been pulled over, the defendant pointed out a temporary license tag in the rear window which the officer had not seen when he stopped or approached the car. <u>Id.</u> The officer then asked for the defendant's registration, insurance and driver's license. <u>Id.</u> While waiting for the defendant to produce this documentation, the officer smelled marijuana odor emanating from the car, which eventually led to the officer searching the vehicle. <u>Id.</u> at 701-02.

The defendant argued that as soon as the officer saw that he had valid temporary tags on his vehicle, the officer should have ended the encounter immediately. <u>Id.</u> at 701. The Eighth Circuit disagreed, holding that the officer's traffic stop was justified because it was based on a reasonably objective mistake. <u>Id.</u> Once an officer makes a justifiable traffic stop, he is allowed to ask for registration, driver's license and insurance. <u>Id.</u> at 702.

Here, the Eighth Circuit case law supports Officer Jackson's request to verify the identities of the occupants of the vehicle. Once Mr. Seid gave a false name and date of birth that Officer Jackson was unable to verify, Officer Jackson was justified in continuing the traffic stop until his reasonable suspicions about the passenger giving a false name were dissipated or confirmed.

### 3. Search of Mr. Seid's Vehicle

Mr. Seid also argues the warrantless search of his vehicle violated his Fourth Amendment rights. Where a warrantless search occurs, the burden is on the government to show by a preponderance of the evidence that an exception to the warrant requirement applies. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005). The government argues the plain view exception to the warrant requirement applies in this instance.

Because *any* evidence seized by the police will likely be in plain view, the plain-view doctrine may only be used to justify a warrantless seizure when the initial intrusion that brings the police within plain view of the items seized is supported by one of the recognized exceptions to the warrant requirement. Horton v. California, 496 U.S. 128, 135 (1990). The plain-view doctrine does not stand alone; rather it works in conjunction with a prior justification for the lawful presence of the police at the place of the warrantless seizure. Id. (quoting Coolidge, 403 U.S. at 465-66). That is, a police officer who comes across evidence while in hot pursuit of a fleeing suspect, while validly arresting a defendant, or while executing a valid search warrant for other objects may rely on the plain view doctrine to seize items in plain view that are not covered by a warrant. Id. at 135-36 (quoting Coolidge, 403 U.S. at 465-66). Finally, if a police officer has some legitimate reason for being present that is *unconnected* with a search directed against the defendant, that is, an officer is

not searching for evidence against the accused, then any incriminating objects in plain view may be seized without a warrant. Id. at 135.

In short, the plain view exception to the warrant requirement applies whenever officers "are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." Evans, 830 F.3d at 766 (quotation omitted).

It is lawful for law enforcement to look through the windows of a motor vehicle. United States v. Bynum, 508 F.3d 1134, 1136-37 (8th Cir. 2007). "The act of looking through a car window is not a search for Fourth Amendment purposes because 'a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car.' . . . Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has right to be in close proximity to the vehicle." Id. at 1137  (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing Texas v. Brown, 460 U.S. 730, 740 (1983)), and citing United States v. Beatty, 170 F.3d 811, 814 (8th Cir. 1999)).

Here, Officer Jackson saw a methamphetamine pipe in plain view from a location where he was lawfully permitted to be.  The contraband nature of the pipe was immediately apparent to him.  Thus, he was entitled to search the vehicle based on the presence of the pipe.  Upon ordering Mr. Seid out of the

car, the handgun was also in plain view and contributed to the probable cause for the search. The court finds the search of the white sedan did not violate Mr. Seid's rights.

## CONCLUSION

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends denying Mr. Seid's motion to suppress [Docket No. 25] in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 15th day of December, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge